Appeal No. 2014-1065

# 𝕰nited 𝕾tates 𝕮ourt of 𝕬ppeals

### *for the*

# 𝕱ederal 𝕮ircuit

INSITE VISION INCORPORATED, INSPIRE PHARMACEUTICALS, INC.
and PFIZER INC.,

*Plaintiffs-Appellees,*

– v. –

SANDOZ, INC.,

*Defendant-Appellant,*

– and –

SANDOZ GMBH and SANDOZ INDUSTRIAL PRODUCTS S.A.,

*Defendants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT
OF NEW JERSEY IN CASE NO. 11-CV-03080-MLC-LHG,
JUDGE MARY L. COOPER

## BRIEF OF PLAINTIFFS-APPELLEES INSITE VISION INCORPORATED, INSPIRE PHARMACEUTICALS, INC. AND PFIZER INC.

DOMINICK A. CONDE
VISHAL C. GUPTA
MARGARET A. SCOOLIDGE
ALYSSA B. MONSEN
FITZPATRICK, CELLA, HARPER & SCINTO
1290 Avenue of the Americas
New York, New York 10104
(212) 218-2100

– and –

DENNIS C. AELING
FITZPATRICK, CELLA, HARPER & SCINTO
650 Town Center Drive, Suite 1600
Costa Mesa, California 92626
(714) 540-8700

*Attorneys for Plaintiffs-Appellees Inspire Pharmaceuticals, Inc. and Pfizer Inc.*

SHEILA F. MCSHANE
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*Attorney for Plaintiffs-Appellees InSite Vision Incorporated, Inspire Pharmaceuticals, Inc. and Pfizer Inc.*

June 19, 2014

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel for the Plaintiffs-Appellees

Inspire Pharmaceuticals, Inc., and Pfizer Inc. certifies the following:

1.  The full name of every party represented by me is:

    Inspire Pharmaceuticals, Inc.

    Pfizer Inc.

2.  The names of the real parties in interest represented by me are:

    Oak Pharmaceuticals, Inc.

    Inspire Pharmaceuticals, Inc.

    Pfizer Inc.

3.  All parent corporations and any publicly held companies that own 10

percent or more of the stock of the parties represented by me are:

    Inspire Pharmaceuticals, Inc. is a wholly-owned subsidiary of Oak

Pharmaceuticals, Inc. which is a wholly-owned subsidiary of Akorn, Inc. which is

a publicly traded company on the NASDAQ stock exchange under the ticker

symbol AKRX. Pfizer Inc. is a publicly traded company on the New York Stock

Exchange (NYSE) under the ticker symbol PFE.

4.  The names of all law firms and the partners or associates that appeared

for the parties represented by us in the trial court, or are expected to appear in this

Court, are:

Fitzpatrick, Cella, Harper & Scinto

for Inspire Pharmaceuticals, Inc. and Pfizer Inc.:

    Dominick A. Conde
    Lisa B. Pensabene
    Joshua I. Rothman
    Vishal C. Gupta
    Margaret A. Scoolidge
    Dennis C. Aeling
    Alice Braginsky
    Alyssa B. Monsen


Gibbons P.C.

for InSite Vision Incorporated, Inspire Pharmaceuticals, Inc., and Pfizer

Inc.:

    Sheila F. McShane
    Owen J. McKeon
    Jillian A. Centanni


Dated:    June 19, 2014          Respectfully submitted,

                        /s/ Dominick A. Conde

                        Dominick A. Conde
                        Fitzpatrick, Cella, Harper & Scinto
                        1290 Avenue of the Americas
                        New York, NY 10104
                        (212) 218-2204

                        *Attorney for Plaintiffs – Appellees*
                        *Inspire Pharmaceuticals, Inc. and*
                        *Pfizer Inc.*

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel for the Plaintiffs-Appellees

InSite Vision Incorporated, Inspire Pharmaceuticals, Inc., and Pfizer Inc. certifies

the following:

1.     The full name of every party represented by me is

InSite Vision Incorporated

Inspire Pharmaceuticals, Inc.

Pfizer Inc.

2.   The names of the real parties in interest represented by me are:

Oak Pharmaceuticals, Inc.

InSite Vision Incorporated

Pfizer Inc.

3.   All parent corporations and any publicly held companies that own 10

percent or more of the stock of the parties represented by me are:

Inspire Pharmaceuticals, Inc. is a wholly-owned subsidiary of Oak

Pharmaceuticals, Inc. which is a wholly-owned subsidiary of Akorn, Inc. which is

a publicly traded company on the NASDAQ stock exchange under the ticker

symbol AKRX.  InSite Vision Incorporated is a publicly traded company on the

over-the-counter bulletin board (OTCBB) stock exchange under the ticker symbol

INSV.  Pfizer Inc. is a publicly traded company on the New York Stock Exchange (NYSE) under the ticker symbol PFE.

4.  The names of all law firms and the partners or associates that appeared for the parties represented by us in the trial court, or are expected to appear in this Court, are:

Gibbons P.C.

for InSite Vision Incorporated, Inspire Pharmaceuticals, Inc., and Pfizer Inc.:

    Sheila F. McShane
    Owen J. McKeon
    Jillian A. Centanni

Fitzpatrick, Cella, Harper & Scinto

for Inspire Pharmaceuticals, Inc. and Pfizer Inc.:

    Dominick A. Conde
    Lisa B. Pensabene
    Joshua I. Rothman
    Vishal C. Gupta
    Margaret A. Scoolidge
    Dennis C. Aeling
    Alice Braginsky
    Alyssa B. Monsen

Hunton & Williams LLP

for InSite Vision Incorporated:

    Rodger L. Tate
    Robert M. Schulman

Jeff B. Vockrodt

Dated:    June 19, 2014                    Respectfully submitted,

                                           /s/ Sheila F. McShane_____

                                           Sheila F. McShane
                                           GIBBONS P.C.
                                           One Gateway Center
                                           Newark, New Jersey 07102
                                           (973) 594-4367

                                           *Attorney for Plaintiffs – Appellees
                                           InSite Vision Incorporated, Inspire
                                           Pharmaceuticals, Inc., and Pfizer Inc.*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ....................................................................... i

TABLE OF CONTENTS............................................................................... iii

TABLE OF AUTHORITIES ........................................................................ vii

STATEMENT OF RELATED CASES ........................................................... x

JURISDICTIONAL STATEMENT ............................................................... 1

STATEMENT OF THE ISSUES................................................................... 1

PRELIMINARY STATEMENT .................................................................... 2

STATEMENT OF THE CASE...................................................................... 5

STATEMENT OF THE FACTS .................................................................... 6

I.     The '411 Patent.................................................................................... 6

      A.     Barriers To Ophthalmic Drug Delivery .................................... 6

             1.     Physiological Barriers.................................................... 7

             2.     Anatomical Barriers ...................................................... 8

      B.     Treating Ocular Infections ..................................................... 11

      C.     Selecting Antibiotics To Treat Ocular Infections ................... 12

             1.     There Were Many Options For Making  An
                    Improved Topical Ophthalmic Antibiotic..................... 12

             2.     Fluoroquinolone Antibiotics ......................................... 13

             3.     Macrolide Antibiotics ................................................... 13

II.     ISV Patents ....................................................................................... 16

      A.     Drug Formulation Is Challenging ........................................... 17

       1.    Factors For Developing Topical Ophthalmic Formulations ................................................ 17

       2.    There Were Many Ocular Drug Delivery Vehicles Available ....................................................... 19

    B.    Claims Reciting pH and $MIC_{50}$ Limitations.............................. 20

SUMMARY OF THE ARGUMENT ........................................................ 21

ARGUMENT ...................................................................................... 24

III.    Standard Of Review.................................................................... 24

IV.    Legal Standard For Obviousness............................................... 25

V.    The '411 Patent Is Not Obvious ................................................ 25

    A.    Sandoz's "Framing" Argument Concerning Obviousness Fails ........................................................... 25

       1.    Determining The Problem To Be Solved Is A Factual Inquiry ................................................... 26

       2.    Case Law Does Not Support Sandoz's Framing Of The Obviousness Issue.................................. 28

       3.    Sandoz's "Framing" Impermissibly Uses Hindsight ......................................................... 30

       4.    The District Court's Problem To Be Solved Was Not Limited to Corneal Infections ................................. 31

    B.    The Court's Findings Support Non-Obviousness .................... 33

       1.    There Were Many Ophthalmic Treatment Options ....... 34

       2.    The Prior Art Discouraged The Use Of Macrolides ...... 36

       3.    Azithromycin's Chemical Properties Discouraged Its Use For Topical Ophthalmic Formulation ............... 38

4.   Azithromycin's Systemic Properties Would Not Have Provided Motivation or Reasonable Expectation of Success ................................. 39

5.   Once Daily Dosing of Claim 3 Was Not Obvious ......... 44

6.   The Dosing Range of Claim 5 Was Not Obvious .......... 45

7.   Dr. Reed's Own Patent Application Undermines Sandoz's Positions ......................................... 46

VI.   The ISV Patents Are Not Obvious ...................................... 46

A.   Sandoz's "Framing" Argument Fails ....................................... 46

B.   The District Court Correctly Found That The Inventions Of The ISV Patents Were Not Obvious ................................. 47

1.   The Art Taught Away From Using An Aqueous Polymer With Azithromycin ............................................ 47

2.   Sandoz Failed To Show It Was Obvious To Select Polycarbophil From Among Innumerable Options ....... 48

3.   The District Court Correctly Found That The Art Would Not Have Motivated A POSITA To Select Polycarbophil Or Provided An Expectation Of Success ....................................................... 50

4.   The District Court Correctly Found The ISV Inventions Non-Obvious Over The '411 Patent ............ 55

C.   Claims Reciting pH and MIC Limitations Are Not Obvious ........................................................ 58

1.   Claims Reciting pH Limitations ................................... 58

2.   Claims Reciting MIC Limitations ................................. 60

3.   Remaining Patent Claims .............................................. 61

VII.   The District Court Correctly Found That Unexpected Results And Long-Felt Need Support Nonobviousness ................................. 61

VIII.  Exclusion Of The EPO Documents Was Not An Abuse of
       Discretion ............................................................................. 63

CONCLUSION ............................................................................. 67


CERTIFICATE OF SERVICE ................................................... B1

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME,
       TYPE-FACE AND TYPE-STYLE REQUIREMENTS ................... B3

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alcon Research, Ltd. v. Apotex Inc.*,
    687 F.3d 1362 (Fed. Cir. 2012) ............................................................ 28, 45

*Am. Hosp. Supply Corp. v. Travenol Labs.*,
    745 F.2d 1 (Fed. Cir. 1984) ........................................................................62

*Chimie v. PPG Indus. Inc.*,
    402 F.3d 1371 (Fed. Cir. 2005) ..................................................................63

*Commonwealth Scientific v. Buffalo Tech., Inc.*,
    542 F.3d 1363 (Fed. Cir. 2008) ..................................................................26

*Daiichi Sankyo Co., Ltd.v. Matrix Labs, Ltd.*,
    619 F.3d 1346 (Fed. Cir. 2010) ............................................................ 34, 48

*Dawson v. Dawson*,
    710 F.3d 1347 (Fed. Cir. 2013) ..................................................................53

*DyStar Textilfarben GmbH v. C.H. Patrick Co.*,
    464 F.3d 1356 (Fed. Cir. 2006) ..................................................................39

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
    227 F.3d 1361 (Fed. Cir. 2000) ..................................................................30

*Eli Lilly & Co. v. Teva Pharms. USA, Inc.*,
    619 F.3d 1329 (Fed. Cir. 2010) ..................................................................50

*Eli Lilly & Co. v. Zenith Goldline Pharmaceuticals, Inc.*,
    471 F.3d 1369 (Fed.Cir. 2006) ...................................................................34

*Galderma Labs., LP v. Tolmar, Inc.*,
    737 F.3d 731 (Fed. Cir. 2013) ....................................................................29

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966)........................................................................................25

*Hambsch v. Dep't of the Treasury*,
    796 F.2d 430 (Fed. Cir. 1986) ............................................................ 24, 44

*In re Cyclobenzaprine Hydrocholoride Extended-Release*
    *Capsule Patent Litig.*,
    676 F.3d 1063 (Fed. Cir. 2012) .......................................................... 24, 25

*In re Dillon*,
    919 F.2d 688 (Fed. Cir. 1990) ...............................................................39

*In re Lintner*,
    458 F.2d 1013 (C.C.P.A. 1972)..............................................................29

*In re Lister*,
    583 F.3d 1307, 1311 (Fed. Cir. 2009) ...................................................66

*In re Paoli R.R. Yard PCB Litig.*,
    113 F.3d 444 (3d Cir. 1997) ...................................................................24

*Interconnect Planning Corp. v. Feil*,
    774 F.2d 1132 (Fed. Cir. 1985) .............................................................30

*Konstantopoulos v. Westvaco Corp.*,
    112 F.3d 710 (3d Cir. 1997) ...................................................................65

*KSR Int'l v. Teleflex*,
    550 U.S. 398 (2007)................................................................................26

*LEO Pharm. Prod. Ltd v. Rea*,
    726 F.3d 1346 (Fed. Cir. 2013) .............................................................50

*Mahurkar v. C.R. Bard, Inc.*,
    79 F.3d 1572 (Fed. Cir.1996) ................................................................42

*Merck & Co., Inc. v. Biocraft Labs., Inc.*,
    874 F.2d 804 (Fed. Cir. 1989) ...............................................................49

*Microsoft Corp. v. i4i Ltd. P'ship*,
    131 S.Ct. 2238 (2011)..............................................................................24

*Mintz v. Dietz & Watson*,
    679 F.3d 1372 (Fed. Cir. 2012) ........................................................ 26, 30

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
    520 F.3d 1358 (Fed. Cir. 2008) .............................................................30

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
566 F.3d 989 (Fed. Cir. 2009) .........................................................................25

*Sanofi-Synthelabo v. Apotex, Inc.*,
470 F.3d 1368 (Fed. Cir. 2006) ......................................................................64

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*,
655 F.3d 1364 (Fed. Cir. 2011). ....................................................................24

*Takeda Chem. Indus. V. Alphapharm Pty., Ltd.*,
492 F.3d 1350 (Fed. Cir. 2007) ......................................................................34

*Unigene Labs., Inc. v. Apotex, Inc.*,
655 F.3d 1352 (Fed. Cir. 2011) ............................................................... 25, 36

*Upjohn Co. v. MOVA Pharm. Corp.*,
225 F.3d 1306 (Fed. Cir. 2000) ......................................................................62

## Statutes

28 U.S.C. § 1291 .................................................................................................1

28 U.S.C. § 1331 .................................................................................................1

28 U.S.C. § 1338(a) ............................................................................................1

European Patent Convention art. 54(2)............................................................66

Fed. R. Civ. P. 16(e)..........................................................................................63

## STATEMENT OF RELATED CASES

Plaintiffs-Appellees InSite Vision Incorporated ("InSite"), Inspire Pharmaceuticals, Inc. and Pfizer Inc. ("Pfizer") (collectively "Plaintiffs") state that no other appeal in or from this civil action in the District Court was previously filed before this or any other appellate court. *InSite Vision, et al. v. Mylan Pharmaceuticals, Inc., et al.*, No. 13-03720-MJC-LHG (D.N.J., filed 6/14/13) involves invalidity challenges to the patents at issue here, and therefore may be affected by the Court's decision.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over the patent infringement claims asserted by Plaintiffs and the declaratory judgment counterclaims asserted by Defendant-Appellant Sandoz, Inc. and Defendants Sandoz GmbH and Sandoz Industrial Products S.A. (collectively "Sandoz") pursuant to 28 U.S.C. §§ 1331 and 1338(a). The Final Judgment in favor of Plaintiffs was entered on November 15, 2013. Sandoz filed a Notice of Appeal on November 1, 2013 and an Amended Notice of Appeal on November 22, 2013. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether the District Court correctly found that Sandoz failed to prove by clear and convincing evidence that the asserted claims of the patents-in-suit are obvious, where the trial evidence — including admissions from Sandoz's experts — overwhelmingly supports the Court's fact findings and Sandoz failed to raise any cognizable legal error.

2.    Whether the District Court abused its discretion in denying Sandoz's "eleventh hour" motion to amend the Final Pretrial Order to add certain European Patent Office documents ("the EPO Documents") and, effectively, a new invalidity theory to this case.

- 1 -

## PRELIMINARY STATEMENT

Developing ophthalmic drug formulations is extremely challenging. The parties' experts all agreed that the eye is designed to prevent foreign substances from penetrating – frustrating the very objective that a formulator seeks to achieve. AzaSite® (covered by the patents-in-suit) not only achieves that difficult objective, but also can be dosed once daily, an advantage Sandoz's expert hailed as "fantastic," and which no other commercial ophthalmic antibiotic has achieved to date.

Admitting infringement, Sandoz's sole defense is obviousness. But following an eight-day trial, the District Court found that Sandoz failed to prove by clear and convincing evidence that any of the asserted claims were obvious. Among other things, the Court found:

- For the '411 patent, there was no motivation or expectation that topical application of azithromycin to treat ocular infections would succeed – the art taught away from such use, recognizing that macrolide compounds (which include azithromycin) were a "poor choice" for topical ophthalmic products and that azithromycin's chemical properties were unfavorable for ocular penetration;

- For the ISV patents, there was no motivation or expectation that combining azithromycin and water-based polycarbophil would

- 2 -

succeed – the art taught away from using azithromycin in water-based formulations because it is unstable and poorly soluble in water;

- Based on his own admissions, Sandoz's primary expert, Dr. Reed, employed hindsight in his obviousness analysis of the patents-in-suit;

- Using hindsight, Sandoz's experts failed to consider the "innumerable" other possible options to using azithromycin for a topical ophthalmic formulation, and to using polycarbophil as a carrier in such formulations;

- Dr. Reed's own real-world experience "undermined" his testimony at trial – although a seasoned ophthalmic drug developer at the time of the inventions, he failed to suggest the use of the claimed inventions before the patents-in-suit;

- The claimed inventions exhibited unexpected results, including extremely high ocular penetration demonstrated by undisputed data;

- Azasite® met a long-felt need for ophthalmic formulations that could be dosed less frequently; and

- The testimony of Plaintiffs' experts was more credible than Sandoz's experts.

To succeed on appeal, Sandoz must show that each of those findings is clearly erroneous. Sandoz has not and cannot do so. Aside from a single footnote

(Sandoz Brief ("SBr.") 43 n.4), Sandoz nowhere challenges any finding as clearly erroneous.

Lacking any case of factual error, Sandoz argues that the District Court legally erred by "misframing the obviousness inquiry." Sandoz is wrong.

Identifying the "market need" or problem to be solved by a person of ordinary skill in the art ("POSITA") is a factual issue, not a legal one. Sandoz cites no case holding otherwise. After considering all of the evidence, the District Court, "standing in the shoes" of a POSITA and based on the evidence presented at trial, correctly found that the problem to be solved was "to develop a topical treatment for ocular infections."

In contrast, Sandoz's framing improperly employs hindsight, using the claims as a roadmap – starting with the assumption that a POSITA would use azithromycin or water-based polycarbophil. As a result, Sandoz's analysis improperly excludes consideration of the art as a whole. In particular, Sandoz's analysis wrongly excludes the "innumerable" other available alternatives to azithromycin for use as a topical ophthalmic treatment and ignores that azithromycin is unstable in water.

In sum, the District Court properly applied the correct legal standard for obviousness to detailed (and often uncontested) fact findings, correctly concluding

that Sandoz failed to meet its burden of showing that the asserted claims were obvious by clear and convincing evidence.

## STATEMENT OF THE CASE

InSite owns U.S. patents-in-suit nos. 6,239,113 ("the '113 patent"), 6,569,443 ("the '443 patent") and 7,056,893 ("the '893 patent") (collectively "ISV patents"). Pfizer owns U.S. patent-in-suit no. 6,861,411 ("the '411 patent"). Inspire Pharmaceuticals holds licenses to the patents-in-suit and is the holder of New Drug Application No. 50-810 for AzaSite®, which is covered by the four patents-in-suit.[1]

Sandoz filed Abbreviated New Drug Application ("ANDA") No. 202308 seeking Food and Drug Administration ("FDA") approval to sell generic copies of AzaSite® before expiration of the patents-in-suit. In response to Sandoz's paragraph IV notice letter, Plaintiffs sued Sandoz in the Court below. Because Sandoz stipulated to infringement, the only issue at trial was whether the asserted claims were obvious.

During an eight-day bench trial, the District Court heard live testimony of six expert witnesses (Drs. Asbell, Abelson and Lee for Plaintiffs and Drs. Reed, Goren, and West for Sandoz) and video depositions of five fact witnesses including

---

[1]    Since the filing of the Notice of Appeal, Inspire was acquired by Oak Pharmaceuticals, Inc. and the AzaSite® NDA was transferred to Oak.

the inventors, Drs. Ahmed and Bowman.  The Court issued a 100-page Opinion, holding that all asserted claims were not obvious and entered final judgment that the effective date of approval of Sandoz's ANDA products would not be earlier than the expiration of the patents-in-suit.  Sandoz appeals.

## STATEMENT OF THE FACTS

## I.    The '411 Patent

The '411 patent claims methods of treating ocular infections by topically applying azithromycin compositions to the eye.  Azithromycin is a macrolide antibiotic and also is an azalide, a macrolide subclass.

Asserted claims 3 and 5 recite methods of treating ocular infections using azithromycin compositions administered "once daily" (claim 3) or compositions with azithromycin concentrations of 0.2 to 2.0 weight percent (claim 5).

### A.    Barriers To Ophthalmic Drug Delivery

To be effective when topically applied, an antibiotic must penetrate ocular tissues to reach the site of infection and impart antibiotic activity.  A18-19; A5146-47 (Goren); A5533-34, A5542 (Asbell); A16416-29, at A16417-18 (Lesar).  Because of numerous complex barriers to the eye, researchers are unable to predict whether "any drug topically applied would penetrate ocular tissues."  A5519-22 (Asbell).

Many physiological and anatomical barriers prevent topical ophthalmic penetration. A9-13; A5507-10 (Asbell). Because these complex barriers significantly impact a drug's ability to reach an infection, ocular penetration of topically applied drugs is extremely poor. A11517, A11550-52, at A11552, A11561-62, at A11561 (Reddy); A16417-18 (Lesar); A16383-415, at A16396-97 (Goodman).



A19354.

### 1. Physiological Barriers

Many physiological defense mechanisms, including blinking, tearing, and nasolacrimal drainage, protect the eye from foreign objects. A13; A5507-08 (Asbell); A19361; A16417-18 (Lesar). These mechanisms keep the ocular surface

clear of foreign substances, limiting the time a drug remains on the surface. A16417-18 (Lesar); A19396 (Goodman). The District Court found that these mechanisms pose challenges in "predicting whether a given topical ophthalmic drug will penetrate ocular tissue" and that the development of topical ophthalmic drugs is "primitive primarily due to these barriers." A13; A5519-22 (Asbell); A11561 (Reddy).

### 2. Anatomical Barriers

The ability of a topical ophthalmic antibiotic to reach an infection also is hindered by anatomical barriers, *e.g.*, the tear film and the multiple layers that comprise the conjunctiva and cornea, under the tear film layer. A9-12.



A19356.

To be effective, a drug must be soluble in and able to penetrate the tear film, which includes an aqueous layer covering the outer surface of the eye. A26; A6260-61 (Lee); A5762 (Reed); A16391 (Goodman); A11569-71, at A11569, A11705-07, at A11706 (Reddy); A19401.  The District Court found that the tear film is a barrier that "serves to keep foreign material (including topical medicaments) out of the eye."  A11.



A19357.

The conjunctiva is inside the eyelid, in the cul-de-sac and over the white portion of the eye.  A11-12; A5500-01 (Asbell).  It consists of the epithelium and lamina propria.  A5122-23 (Goren).  The epithelial layer is comprised of multi-layered, stratified squamous cells connected by tight junctions, which deter foreign objects from entering the eye.  A5500-02 (Asbell); A6097-99 (Abelson); A16391 (Goodman); A19257, A19312-16 (Gray's Anatomy).



A19359.

The cornea is the structure through which light enters the eye. A12. Three corneal layers are barriers to topical drug penetration: the corneal epithelium, the stroma, and the endothelium. The multilayered corneal epithelium is comprised of lipophilic (fat-loving), tightly joined cells that ensure "foreign particles do not penetrate the cornea." A12; A5502-10, A5520-22 (Asbell); A6099-100 (Abelson); A16418 (Lesar); A11550, A11615-16 (Reddy); A16397 (Goodman); A19312-16 (Gray's Anatomy). The stroma, the thickest layer, is hydrophilic (water-loving), while the endothelium layer is lipophilic. A11550, A11621 (Reddy); A6272 (Lee). The lipophilic epithelium and endothelium layers are barriers to hydrophilic molecules, while the hydrophilic stroma layer is a barrier to lipophilic molecules. These alternating lipophilic and hydrophilic barriers make drug penetration

difficult because a drug that is too lipophilic or hydrophilic will not penetrate. A6272-6275 (Lee); A16418-19 (Lesar); A11550, A11621 (Reddy); A16397 (Goodman).

### B.    Treating Ocular Infections

Ocular infections are caused by many different bacteria and affect all parts of the eye.  A13; A5529, A5535 (Asbell).  Conjunctivitis (conjunctiva infections) and corneal ulcers (which can cause blindness) exist in the multiple layers of the conjunctiva and cornea and immediately adjacent regions.  A12970; A5529-31 (Asbell); A6091-92 (Abelson).  To treat these infections, a topical antibiotic must penetrate the infected tissue and remain for a sufficient time to impart antibiotic effect.  A13; A5533-34 (Asbell).  In addition, "[a]n infection presenting in one part of the eye, *e.g.*, the conjunctiva, can spread to other parts of the eye, *e.g.*, the cornea."  A13; A5531-32 (Asbell).  The District Court found that it is "undisputed in the record that a POSITA would prefer to formulate an antibiotic that would permeate both conjunctival tissues and corneal tissues."  A46; A5531-34 (Asbell); A6091-93, A6108 (Abelson).

Topical administration of antibiotics differs significantly from oral administration.  A16-18; A5519-20, A5545-47 (Asbell).  Both sides' experts agreed that drug penetration is vastly different in the eye as compared to the intestines ("gut").  The gut is designed to absorb, while the eye, with its barriers

and defenses, is designed to prevent penetration of topically applied drugs. A5134-45 (Goren); A5897-5902 (Reed); A6119-27 (Abelson); A19352; A19389-94. As a result, topical drug efficacy and penetrability are unrelated to absorption of orally administered drugs. A16-18; A5545-47 (Asbell).

Likewise, there is no relationship between dosing requirements of oral and topical antibiotics. For example, ciprofloxacin (a fluoroquinolone antibiotic) is dosed six times daily for ophthalmic topical application but only twice daily orally. A18; A5545-47 (Asbell).

### C.    Selecting Antibiotics To Treat Ocular Infections

#### 1.    There Were Many Options For Making An Improved Topical Ophthalmic Antibiotic

At the time of the '411 invention, there were "many hundreds" of antibiotics to consider in developing an improved topical ophthalmic treatment. A19, A29; A6069 (Abelson); A19375. First, a formulator could select from over 100 FDA-approved antibiotics or could reformulate an antibiotic already approved for topical treatment to improve its properties. A29; A5487-88 (Asbell); A6054-55, A6066-67 (Abelson); A16559-779 (PDR); A16780-801 (Orange Book); A16420-23 (Lesar); A19376; A19379. Second, many antibiotics under development could have been considered. A29; A6056-61 (Abelson). Third, a formulator could combine antibiotics to expand the spectrum of bacterial coverage, or combine an antibiotic with another active ingredient (e.g., a steroid). A29; A6061-65

(Abelson); A19377-78.  Fourth, a formulator could make an antibiotic prodrug to enhance ocular penetration.  A29; A6067-69 (Abelson); A19380.

### 2.    **Fluoroquinolone Antibiotics**

At the time of the '411 invention, fluoroquinolone antibiotics were considered "[b]y far the most important new antibiotics in ophthalmology." A16498-519, at A16503 (Ogawa); A19-20; A6081 (Abelson); A16526-46, at A16531 (Serdarevic); A16810-18, at A16816 (Andrews).  Fluoroquinolones were known to possess three important properties: (1) bactericidal (bacteria killing); (2) effectiveness against a broad spectrum of bacteria; and (3) the ability to penetrate ocular tissues.  A19-20; A5538 (Asbell); A6075-76, A6080-81, A6087 (Abelson); A16530-31 (Serdarevic); A19383.

### 3.    **Macrolide Antibiotics**

Erythromycin and clarithromycin are macrolide antibiotics that were commercially available prior to the '411 invention.  Both possess less than favorable properties compared to other available ophthalmic options, including fluoroquinolones.  A20; A5573-74, A5747 (Asbell); A6083, A6087-88 (Abelson). Erythromycin and clarithromycin: (1) have a narrower spectrum of bacterial coverage than other antibiotics; (2) are generally bacteriostatic (inhibit bacteria growth), not bactericidal; and (3) are "essentially insoluble in water."  A20-21; A5573-74, A5592, A5747 (Asbell); A5906-07 (Reed); A6077, A6083-88

(Abelson); A16141-42 (Ahmed); A12358-63, at A12361-62 (Foye); A16520-25, at A16521-23 (Everett); A16551-58, at A16556 (Gladue); A12294-311, at A12298 (Piscitelli).

In practice, topical ophthalmic erythromycin was dosed 4 to 6 times daily—not just once.  A21; A16430-33, at A16431 (Nakagawa); A5547 (Asbell).  And, clarithromycin was *never developed* into a topical ophthalmic formulation because it irritates the ocular surface.  A6280-82 (Lee); A5932 (Reed); A16817 (Andrews); A16863-69, at A16863 (Kuehne); A19413.  As stated in the prior art, macrolides were considered "a *poor choice* for the topical treatment of serious infection…." A16817 (Andrews) (emphasis added); A26-27; A6112-13 (Abelson).

As for azithromycin, another macrolide, nothing known prior to the '411 invention would have led a POSITA to believe that its properties would be even as desirable as erythromycin or clarithromycin.  Similar to erythromycin, azithromycin is bacteriostatic and possesses a narrow spectrum of anti-bacterial activity.  A5905-10 (Reed); A5573-74 (Asbell); A12298-99 (Piscitelli); 12361-62 (Foye).

Also, Sandoz's formulation expert, Dr. Reed, identified important chemical properties for a compound to penetrate the ocular surface: (i) solubility in water (the compound must be soluble in tear fluid); (ii) molecular weight (compounds above 500 Daltons have difficulty penetrating tight junctions in the eye); (iii)

partition coefficient (Log P) (the higher Log P, the less soluble it will be);[2] and (iv) electron charge (charged compounds are less likely to penetrate). A5767-71, A5889-91, A5941-45 (Reed); A6258-76 (Lee); A26-28; A19400.

But, azithromycin's physicochemical properties show it was not well-suited for penetrating the eye, and in fact its properties are less desirable than erythromycin's. Specifically, azithromycin would have difficulty penetrating because: (i) it is "practically" insoluble in water (A26; A6259-62 (Lee); A5936-38 (Reed); A16819-20 (European Pharmacopoeia); A16817 (Andrews); A16802-09, at A16805 (Oh); A19401-02); (ii) its molecular weight (749 Daltons) is large (A28; A6262-65 (Lee); A11570 (Reddy); A16711 (PDR); A19403-04); (iii) its Log P (4.02) is 10-fold higher than erythromycin's (A27; A12312-18, at A12313 (McFarland); A6271-76 (Lee)); and (iv) it is highly charged, while erythromycin is less charged. (A28, A59; A5943-44 (Reed); A6266-71 (Lee); A19406-07).

Finally, although azithromycin achieved high tissue concentrations when dosed orally, there is no correlation between its topical and oral administration. Azithromycin taken orally reaches tissues primarily by a "specialized" blood-stream dependent process called phagocytosis. A24; A5140 (Goren); A6083-84, A6109-10 (Abelson); A16557 (Gladue). But because parts of the eye are avascular

---

[2]    Log P is a measure of how lipophilic or greasy a compound is, with "maximum permeability" at Log P of 2.0-2.5. A11578-79, at A11578 (Reddy); A6258, A6275-76 (Lee); A19409-10.

(without blood), both sides' experts agreed that phagocytosis does not apply to topical ophthalmic application.  A5173-74 (Goren); A6109-10 (Abelson); A6333-34 (Lee); A5990 (Reed); A44-45.

## II.  ISV Patents

The ISV patents are directed to improved formulations of azithromycin and an aqueous-based polycarbophil carrier.  These formulations are convenient (once-daily eye drops), shelf-stable (a characteristic never previously accomplished with liquid azithromycin), and surprisingly, show improved efficacy.

Asserted claims 6-9 of the '113 patent recite topically applying an aqueous polymeric suspension of an azalide.  Claim 6 recites polycarbophil; Claim 7 recites a polymer concentration of 0.5-1.2%; Claim 8 recites monodisperse particle size; and Claim 9 recites azithromycin.

Asserted claims 16 and 44 of the '443 patent recite compositions having 0.1% to 10% of an aqueous polymeric suspending agent and osmotic pressure of 10 to 400 mOsM, 0.01-1.0% (claim 16) or 0.1-5.0% (claim 44) of an azalide, while claim 44 states the composition is a depot.

Asserted claims 4, 6, 7, 9-12, 30, 36 and 40 of the '893 patent are directed to aqueous azalide suspensions having a pH range of 6.0-6.6.  Claims 4 and 36 recite, among other things, 0.5-1.2% of a water swellable water-insoluble crosslinked carboxy-vinyl polymer.  Claim 6 recites a composition where the azalide is

maintained above the $MIC_{50}$ (minimum inhibitory concentration) for at least about 12 hours.  Claim 7 recites azithromycin.  Claim 9 recites a composition containing 0.1-10.0% azalide antibiotic.  Claims 10-12 recite pH ranges, with claim 12 reciting a pH of 6.3.  Claims 30 and 40 recite treatment methods where the composition includes a water swellable water-insoluble crosslinked carboxy-vinyl polymer (claim 30) or administering one or two doses per day for at least six days (claim 40).

## A.    Drug Formulation Is Challenging

The District Court found that "experts in the field agree[d] that designing [topical] ophthalmic drug delivery systems is challenging and incredibly difficult." A54; A5391 (Reed); A6287-92 (Lee).  As put by Dr. Joseph Robinson, an undisputed leader in the field: "It is not an overstatement to say that designing drug delivery systems for the eye is an incredibly difficult task."  A11532-33, at A11532 (Reddy).

### 1.    Factors For Developing Topical Ophthalmic Formulations

The parties' formulation experts agreed that solubility and stability of the active ingredient are "important" to topical formulations.  A57; A5890-91 (Reed);

- 17 -

A6289 (Lee).[3]  "Stability of the aqueous composition is a concern because a formulator would seek to minimize degradation of a drug."  A5891-92 (Reed); A57; *see also* A6289 (Lee).  Accordingly, a "formulator would seek to minimize degradation of [the] active…."  A57; A5892 (Reed).

But azithromycin was known to be unstable in water because it undergoes hydrolysis (decomposition).    A57, A78; A6293, A6410-14 (Lee); A16127, A16130-34 (Ahmed); A16805 (Oh); A16847-62, at A16852 (AHFS Drug Information).   Pfizer (the commercial developer of azithromycin) never sold a water-based azithromycin formulation.  Pfizer sold only a solution-based product in freeze-dried form that required remixing, which was undesirable.  A78; A6294-96 (Lee); A16194-95 (Bowman).

Plaintiffs' formulation expert, Dr. Lee, testified that a POSITA would not have combined azithromycin with a water-based polymer like polycarbophil because "the drug is not stable in water."  A6292.  Sandoz's Dr. Reed never disputed that azithromycin is unstable in water and agreed that this instability would have been a concern.  A78; A5893-94.

Solubility is also important to topical drug formulation because a solution, not a suspension, is the preferred active formulation.  A57; A5615-16, A5771-72,

---

[3]    Other factors that must be considered include tonicity, viscosity, solvent type, buffer type, pH, preservatives, toxicity, patient comfort, and ocular penetration.  A55-58; A5882-84 (Reed); A6287-90 (Lee).

A5891 (Reed).  But azithromycin is only "sparingly soluble" in water.  A26; A5622-24, A5936-38 (Reed); A6261-62, A6277-78 (Lee); A16819 (European Pharmacopoeia); A16812, A16817 (Andrews); A16805 (Oh).

### 2.    There Were Many Ocular Drug Delivery Vehicles Available

Even if a formulator ignored azithromycin's fatal flaws of instability and insolubility in water and nonetheless pursued an aqueous azithromycin formulation, there were a "plethora" of topical ocular drug delivery vehicles available, including solutions, gels, emulsions, combination systems, drug permeability enhancers, suspensions, oils, colloidal systems and ocular inserts. A59-62; A6304-10 (Lee); A19424; A16434-52 (Le Bourlais); A16460-91 (Sasaki). Within each category, numerous options were available.  *Id.*

Dr. Lee testified that, if forced to make an aqueous-based azithromycin formulation, he would have first selected a colloidal system which would potentially encapsulate an active ingredient and protect it from degradation.  There were at least nineteen available colloidal systems to choose from.  Dr. Lee's next choice would have been a "combination system," such as a colloidal system combined with a gel.  Finally, if a formulator were limited to gels alone, there were over 40 choices, and nothing would have directed a POSITA to polycarbophil. A6306-10 (Lee); A19425-27; A11917-19, A11946-50, A11957-59 (Reddy);

A16437-44, A16453 (Le Bourlais); A16479-83, A16486 (Sasaki); A16973-80 ('116 patent).

Dr. Reed ignored all of these options, and instead, used hindsight to focus only on DuraSite®, a polymer delivery system made by InSite. A93; A5875-77 (Reed). Prior to the ISV patents, DuraSite® had never been commercially formulated with any active ingredient. While DuraSite® was used in the dry-eye formulation AquaSite® without any active ingredient, nothing in the prior art would have led a POSITA to combine DuraSite® and azithromycin, or to understand that water-based DuraSite® would somehow solve the instability and insolubility issues of azithromycin. A78-79; A5971-78 (Reed); A6310-24, A6301 (Lee).

## B. Claims Reciting pH and $MIC_{50}$ Limitations

As for pH, it is a critical property of a drug formulation. A83; A5625 (Reed); A6296-98 (Lee). Although pH 7.4 is most suitable for patient comfort, azithromycin is soluble at pH 5.0 or below. Nothing in the prior art suggested that azithromycin would maintain its solubility at pH 6.3, as recited in Claim 12. A97.

As for $MIC_{50}$, no prior art data disclosed azithromycin's ability to penetrate and remain in ocular tissue following topical administration above the $MIC_{50}$ for 12 hours. A97-98; A5524 (Asbell). All of Sandoz's data concerned oral administration. As the District Court correctly found, "Sandoz failed to show any

correlation between concentrations of antibiotics following topical and oral administration."  A98; A5519-20, A5546-47 (Asbell).

## SUMMARY OF THE ARGUMENT

The District Court correctly found that Sandoz failed to meet its burden of proving by clear and convincing evidence that any asserted claim would have been obvious.  Sandoz has not and cannot point to any clear error – most of the Court's findings were based on testimony of Sandoz's witnesses and prior art.

Sandoz's argument that the District Court "misframed the obviousness inquiry" is wrong at least because: (1) identifying the problem a POSITA would have faced at the time of the invention is a factual issue, not a legal inquiry; (2) Sandoz cites no case law holding it is a legal issue; (3) Sandoz's proffered inquiry uses improper hindsight, "focus[ing]" i) for the '411 claims, on azithromycin, while ignoring innumerable alternatives, and ii) for the ISV claims, on water-based polycarbophil, while ignoring that azithromycin is unstable and insoluble in water; and (4) the Court's inquiry did not prevent Sandoz from proving its case under its inquiry, and Sandoz in fact presented evidence directed to that inquiry but failed to meet its burden.

As to the '411 patent, the District Court made well-supported findings that a POSITA would not have been motivated nor had a reasonable expectation of success in using azithromycin as a topical ophthalmic treatment.  Sandoz's experts

- 21 -

failed to consider all of the options available to a POSITA and instead used hindsight. Considering all alternatives, there were far better choices than azithromycin – the art recognized that macrolides, including azithromycin, were "poor choice[s]" for topical ophthalmic formulations, and the chemical properties of azithromycin were unfavorable to ocular penetration.

Sandoz argues that azithromycin's oral uses would have motivated its topical use. The District Court rejected Sandoz's reliance on oral data because the vast differences between drug absorption in the gut and drug penetration of the eye result in "little or no correlation" between oral and topical ophthalmic regimens. Also, a POSITA would be discouraged from making a topical azithromycin ophthalmic formulation because, while orally administered azithromycin reaches an infection via a specialized blood-based delivery method (phagocyctosis), that has very little applicability to topical ophthalmic delivery. And, Sandoz's arguments regarding trachoma were rejected because trachoma is an extraocular infection, and Sandoz's expert conceded that topical azithromycin treatment would not reach infection beyond the eye. Finally, the Court found that Sandoz's positions were undermined by Dr. Reed's real-world failure to suggest using azithromycin for topical ophthalmic use in his own ophthalmic formulation patent, filed just prior to the '411 patent application.

As to the ISV patents, the District Court found that a POSITA would not have been motivated nor had a reasonable expectation of success in using azithromycin with an aqueous polymer because azithromycin is unstable and sparingly soluble in water. Also, the Court credited Dr. Lee's testimony over Dr. Reed's that, even ignoring these aqueous instability and solubility problems, a POSITA had numerous other formulation options that would have been preferable to polycarbophil. Dr. Reed did not even consider these other options.

The Court also correctly rejected Sandoz's references disclosing polycarbophil. They all fail to show that polycarbophil could overcome azithromycin's instability problems, and thus would not lead a POSITA to combine polycarbophil and azithromycin. And again, Dr. Reed's real-world experience belied his opinions. He worked with InSite on polycarbophil, but never suggested its use with azithromycin prior to the ISV patents.

The District Court's nonobviousness ruling also was supported by unexpected properties of the inventions (including extremely high ocular penetration) and the fulfillment of a long-felt need. None of Sandoz's experts disputed any of the specific data Plaintiffs' experts relied upon to show unexpected results. As to long-felt need, two of Sandoz's experts agreed with Plaintiffs' experts that decreasing dosing frequency to once-a-day met a long-felt need.

Finally, the District Court's ruling concerning the '411 patent's status as prior art to the ISV patents was not an abuse of discretion. Regardless, the Court considered the '411 patent and concluded it did not render obvious the ISV claims. Nor did the Court abuse its discretion in excluding the EPO file history proffered on the eve of trial, which Sandoz concedes was "not necessary" to its case.

## ARGUMENT

### III.  Standard Of Review

Sandoz must prove invalidity by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2242-43 (2011). While nonobviousness is a conclusion of law reviewed *de novo*, the trial court's underlying fact findings are reviewed for clear error. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1069 (Fed. Cir. 2012). Those findings are given much deference, especially in assessing the credibility of the witnesses. *Id.; Hambsch v. Dep't of the Treasury*, 796 F.2d 430, 436 (Fed. Cir. 1986).

The Federal Circuit reviews exclusion of evidence under the law of the regional circuit. *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1372 (Fed. Cir. 2011). In the Third Circuit, decisions to exclude evidence are reviewed for abuse of discretion. *In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444, 453 (3d Cir. 1997).

- 24 -

## IV.    Legal Standard For Obviousness

An obviousness analysis considers: (1) the scope and content of the prior art; (2) the differences between the prior art and the claimed invention; (3) the level of ordinary skill in the art; and (4) the objective evidence of non-obviousness. *Cyclobenzaprine,* 676 F.3d at 1068 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)).    Sandoz was required to prove a "motivat[ion] to combine the teachings of prior art references to achieve the claimed invention," and that a person of ordinary skill in the art would have had a "reasonable expectation of success in doing so." *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (citation omitted).    And, it needed to specify how and why its references should be combined to render the patented inventions here obvious. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360-61 (Fed. Cir. 2011).

The District Court correctly found that Sandoz failed to carry its burden of proof.

## V.    The '411 Patent Is Not Obvious

### A.    Sandoz's "Framing" Argument Concerning Obviousness Fails

Sandoz argues that the District Court legally erred by "misframing the obviousness inquiry." (SBr. 3).    Sandoz is wrong for multiple reasons.    First, identifying the problem a POSITA would have faced at the time of the invention is

a factual issue, not a legal inquiry.  Second, Sandoz's "misframing" argument is not supported by its case law.  Third, Sandoz's proffered obviousness analysis improperly utilizes hindsight and views the prior art through a narrow lens, not as a whole, as this Court requires.  Finally, Sandoz misinterprets the District Court's analysis.  The Court did not preclude Sandoz from proving, as Sandoz frames it, that a method of treating conjunctivitis with a topical azithromycin ophthalmic formulation would have been obvious.

### 1. Determining The Problem To Be Solved Is A Factual Inquiry

Under *KSR*, the district court must determine the "design need or market pressure to solve a problem" that a POSITA faced at the time of the invention. *KSR Int'l v. Teleflex*, 550 U.S. 398, 418-21 (2007).  This is a factual inquiry, not a legal one, subject to the clearly erroneous standard of review.  *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377 (Fed. Cir. 2012) (district court's "statement of the problem" to be solved reviewed under a clearly erroneous standard); *see also Commonwealth Scientific & Indus. Research Org. v. Buffalo Tech., Inc.*, 542 F.3d 1363, 1375-76 (Fed. Cir. 2008) (issue of *fact* as to whether a POSITA would have been motivated by "the nature of the problem to be solved").

Here, the District Court expressly considered "'the design need or market pressure' faced by POSITAs" at the time of the '411 invention and rejected

Sandoz's inquiry that the problem to be solved was "whether one could treat conjunctivitis with a topical ophthalmic formulation of azithromycin." A39-40. Based on the evidence at trial, the District Court stood "in the shoes of [a POSITA]" and found that such a person would have considered many factors. But because Sandoz assumes that a POSITA would start with azithromycin and limits the inquiry to conjunctivitis, Sandoz excludes multiple factors that would have been considered, including: (i) the hundreds of other potential available compounds; (ii) azithromycin's and the macrolides' limited antibacterial spectrum; (iii) that azithromycin and the macrolides are bacteriostatic, not bactericidal; and (iv) azithromycin's unfavorable chemical characteristics. A40-41. Sandoz's inquiry also entirely removes corneal penetration as a consideration. But that is inconsistent with testimony of Sandoz's expert Dr. Reed who stated that a POSITA would want "to have a drug go to where the infection is," including in the cornea and not just the conjunctiva. A5885-89; A6091-93 (Abelson) (If "the bug is in the conjunctiva [or] in the cornea…[the drug] has to get there," and if the drug does not, it is "a fool's errand.").

Because Sandoz's analysis excluded these factors from consideration, the District Court rejected Sandoz's framework as "too narrow" and adopted Plaintiffs' problem to be solved, *i.e.,* a POSITA's "desire to develop a topical

treatment for ocular infections," which examined the art as a whole.  A40-41.  That finding of fact was not clearly erroneous.

### 2.    Case Law Does Not Support Sandoz's Framing Of The Obviousness Issue

Sandoz relies primarily on *Alcon Research, Ltd. v. Apotex Inc.,* 687 F.3d 1362 (Fed. Cir. 2012).  But that decision does not hold that framing of the obviousness inquiry is a legal question, and it in fact supports Plaintiffs' nonobviousness positions here.    *Alcon* involved a patent covering topical ophthalmic administration of olopatadine for treating allergies.  The prior art, however, disclosed a topical ophthalmic olopatadine formulation used on guinea pigs to treat allergies, where the olopatadine concentration ranges overlapped the concentrations recited in claims 1-3 and 5-7 of the patent-in-suit.  Finding those claims invalid, this Court emphasized that because there was an overlap in concentrations between the prior art and the claims, the remaining issue was whether a POSITA would have been motivated to adapt the prior art guinea pig formulation to humans.  The Court found such motivation present because the guinea pig models were predictive of olopatadine's activity in humans.  *Alcon,* 687 F.3d at 1367-68.  Notably, Sandoz fails to mention that in *Alcon* this Court affirmed the nonobviousness of claims 4 and 8, which were limited to a concentration of olopatadine not found in the art.  *Id.* at 1370-71.

The relationship between the prior art and the '411 claims here is completely different from the corresponding relationship in *Alcon* between the prior art and the invalid claims. Here, there is no overlap of azithromycin concentrations for topical ophthalmic use as between the prior art and the '411 claims.[4] Nor does any prior art disclose tests of a topical azithromycin ophthalmic treatment in any animal model. As Dr. Reed conceded, prior to the '411 patent there was no disclosure of "topical ophthalmic azithromycin compositions" (A5877; A39), let alone a topical ophthalmic disclosure that overlapped the once daily dosing of claim 3 or the 0.2-2.0% azithromycin concentration of claim 5. Here, like claims 4 and 8 in *Alcon*, the District Court found that a POSITA would not have been motivated to use azithromycin for topical ophthalmic treatment as recited in claims 3 and 5 of the '411 patent.

Moreover, in *Alcon*, this Court pointed out that the district court required motivation to solve a particular problem recited in the claims (to stabilize mast cells). *Alcon,* 687 F.3d at 1368. In contrast, here the District Court's "framing" of

---

[4]    Sandoz's reliance on *In re Lintner*, 458 F.2d 1013, 1015-16 (C.C.P.A. 1972) (SBr. 28) and *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731 (Fed. Cir. 2013) (SBr. 3) is likewise misplaced. Those decisions do not hold that framing of the obviousness issue is a legal question. And, in both cases, there was overlap between the claims and prior art which does not exist here. For example, in *Lintner*, the prior art disclosed the combination of a softener and sugar as claimed in the Lintner patent application, rendering the claims *prima facie* obvious, even though sugar was used for a different purpose in Lintner's application.

the issue was broad, namely, whether it would have been obvious to develop a topical ophthalmic formulation that contained azithromycin and did not require a specific motivation.

### 3. Sandoz's "Framing" Impermissibly Uses Hindsight

As the District Court found, Sandoz's framing of the issue was "fundamentally flawed" because it impermissibly used the invention as a guide. A40-41. *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1138 (Fed. Cir. 1985) ("The invention must be viewed not with the blueprint drawn by the inventor, but in the state of the art that existed at the time."); *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008).

Sandoz's contention that a POSITA would have addressed whether one "could treat conjunctivitis with a topical ophthalmic formulation of azithromycin" assumes a POSITA would select azithromycin as recited in the '411 claims. Sandoz's focus on azithromycin improperly relies on hindsight. A39; A5398, 5874-75 (Reed). *Mintz*, 679 F.3d at 1377 (rejecting a "statement of the problem [that] represents a form of prohibited reliance on hindsight").

Moreover, Sandoz's statement of the problem limits the scope of the prior art to azithromycin and conjunctivitis, and improperly fails to consider the prior art as a whole, as required by *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1372 (Fed. Cir. 2000), a case cited by Sandoz.

### 4.    The District Court's Problem To Be Solved Was Not Limited to Corneal Infections

Nothing prevented Sandoz from offering proof that it would have been obvious to use azithromycin topically to treat conjunctivitis. Sandoz asserts that the District Court required the inquiry to "be directed to a general 'desire to develop a topical treatment for ocular infections,' including for corneal infections, rather than just for conjunctivitis." (SBr.29). But that misstates the Court's problem to be solved, which was directed to a POSITA's desire to develop a topical treatment for any ocular infection. The Court did not limit the issue to corneal infections, or exclude conjunctivitis.

In fact, Sandoz attempted to prove that it would have been obvious to topically treat conjunctivitis with azithromycin, but failed to do so.

The evidence shows that conjunctival drug penetration is difficult and unpredictable. To treat conjunctivitis, "the antibiotic must reach the infected tissue and remain in contact with it for an adequate period of time." But the multiple barriers of blinking, tearing, drainage, and the eye's tear film can prevent penetration. A13; A5146-47 (Goren); A5496-98, A5507 (Asbell); A16391; A16417.

And, the conjunctiva itself is a significant drug barrier. As Plaintiffs' medical expert Dr. Asbell explained, the conjunctiva is a multi-layered membrane, with epithelial and fibrovascular layers. The epithelium is a "very specialized" and

- 31 -

"complex" structure, which is "multilayered" and has "tight junctions...to prevent things from going through." A5500-5502. Plaintiffs' other medical expert, Dr. Abelson, confirmed the complexity of the conjunctiva as a drug barrier. A6097-99.

Dr. Asbell also testified that conjunctivitis treatment requires that a drug penetrate and treat the entire surface of the eye including the cornea, and thus must penetrate both conjunctival and corneal tissues to prevent spread of infection. A46; A5531-34, A5540-44 (Asbell); A6091-92, A6108 (Abelson). Thus, Sandoz's assertions that cornea penetration has "no bearing" on conjunctivitis was refuted at trial, and "fails to consider the likelihood that an infection could spread from the conjunctiva to the cornea." A44.

Finally, Dr. Abelson testified that whether a drug would enter the conjunctiva was unpredictable because it is a "complex barrier," explaining, "[t]here wasn't an algorithm that you could plug in the characteristics of your molecule and the characteristics of the conjunctiva and say, yes, it will get in, and it will get in a lot [or] a little." A6099-100 (Abelson).

Thus, while Sandoz's medical expert Dr. Goren testified generally that conjunctivitis is "easier to treat" than corneal ulcers (A14), as discussed above, Drs. Asbell and Abelson specifically detailed why conjunctival penetration is a difficult problem. Sandoz therefore failed to prove obviousness under its inquiry,

at least because the testimony showed that drug penetration of the conjunctiva was a significant challenge, and unpredictable.

Sandoz also failed to prove obviousness under its inquiry because facts supporting the District Court's findings that a POSITA would not have been motivated to use, or expected success with, a topical ophthalmic azithromycin formulation are applicable to both conjunctivitis and corneal infections. Sandoz relies heavily on "conjunctivitis caused by *C. trachomatis* infection." (SBr. 29-32). But the Court made specific fact findings why a POSITA would have been led away from topical ophthalmic formulation to treat *C. trachomatis*. *Infra* Section V.B.4. Likewise, the prior art showing that macrolides, including azithromycin, were a "poor choice" does not distinguish between conjunctivitis and corneal infections. *Infra* Sections V.B.2-3.

### B.    The Court's Findings Support Non-Obviousness

The District Court made detailed factual findings why a POSITA would not have been motivated nor had a reasonable expectation of success in using azithromycin as a topical treatment for ophthalmic infections. Those findings were well-supported and not clearly erroneous.

The Court considered all of the other potential drug options and found those options would have directed a POSITA away from azithromycin. The Court also considered macrolides and azithromycin itself, finding that those in the art

considered macrolides a "poor choice" for ophthalmic use, and that azithromycin's chemical properties were unfavorable for topical ophthalmic application. The Court rejected Sandoz's assertions based on oral use of azithromycin because there is no correlation between oral and topical ophthalmic drug penetration. Finally, the Court confirmed its analysis based on Sandoz's expert's real-world, contemporaneous failure to use azithromycin ophthalmically prior to the '411 invention, despite every opportunity to do so.

### 1.     There Were Many Ophthalmic Treatment Options

The obviousness analysis here starts by identifying a compound to formulate, an inquiry that considers "functional properties and limitations of the prior art compounds," and "must avoid hindsight bias." *Daiichi Sankyo Co., Ltd. v. Matrix Labs, Ltd.,* 619 F.3d 1346, 1354 (Fed. Cir. 2010) (citing *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.,* 471 F.3d 1369, 1377-79 (Fed. Cir. 2006)); *Takeda Chem. Indus. Ltd. v. Alphapharm Pty., Ltd.,* 492 F.3d 1350, 1357-58 (Fed. Cir. 2007) (analysis starts with the prior art compound with the most favorable properties). Sandoz thus bears the burden of showing by clear and convincing evidence that a POSITA had reason to select azithromycin "over other compounds in the prior art." *Daiichi,* 619 F.3d at 1354. The District Court correctly found that Sandoz failed to meet this burden.

It is undisputed that there were a myriad of choices of active ingredients for an improved topical ophthalmic treatment for ocular infections. *Supra* Section I.C.1. These hundreds of options included "FDA-approved drugs for purposes other than the approval given by the FDA; combinations of antibiotics with each other and with other active ingredients; antibiotics that were in the pipeline; improvements to existing topical treatments; and even prodrugs." A40-41; *Id.*

Moreover, Sandoz does not challenge the District Court's findings that a POSITA would have used a fluoroquinolone (including those in development) rather than azithromycin. Fluoroquinolones were "[b]y far the most important new [class of] antibiotics in ophthalmology," possessing two important properties that azithromycin did not – the ability to kill bacteria and to act on a broad range of bacteria. *Supra* Sections I.C.2-3. The absence of these properties would have discouraged a POSITA from using azithromycin. A47; A6076-77, A6083-85, A6086-88 (Abelson).

None of Sandoz's experts addressed any non-macrolide option to azithromycin as a starting point for the obviousness analysis here. As the District Court found, Sandoz "fail[ed] to consider the suitability of azithromycin by comparison to other non-macrolide antibiotics," and instead used impermissible hindsight to select azithromycin. A45-46. The Court's hindsight findings were

based on Dr. Reed's testimony, who "focused" on azithromycin to the exclusion of other compounds.  A39; A5398 (Reed).

Sandoz argues that it was "obvious to try" azithromycin to topically treat the eye.  (SBr. 31).  But, the District Court found that "[t]he availability of the innumerable other options is far from [a] 'finite number of identified, predictable solutions,'" which is necessary to prove that an invention is obvious to try.  A46 (citing *KSR*, 550 U.S. at 421); *Unigene*, 655 F.3d at 1361 ("When a field is 'unreduced by direction of the prior art,' and when prior art gives 'no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful,' an invention is not obvious to try.").

### 2.    The Prior Art Discouraged The Use Of Macrolides

The District Court found that the properties of macrolide antibiotics would have directed a POSITA away from pursuing azithromycin as a topical ophthalmic treatment.  A47.  Those findings were well supported.

Macrolides have a relatively narrow spectrum of activity compared to other antibiotics and were known to be bacteriostatic (inhibiting bacterial growth) rather than bactericidal (bacteria killing).  *Supra* Section I.C.3.  Thus, Sandoz's attempts to tout the potency of azithromycin (SBr. 31-32) are misplaced.

At the time of the '411 invention, the only commercial topical ophthalmic macrolide was an erythromycin ointment, which the experts agreed was disfavored

by clinicians because it was messy, vision-impairing, and uncomfortable. A21; A6114-15 (Abelson); A5547-48 (Asbell); A5634-35, A5884-85 (Reed); A16611. Moreover, as the Court found, erythromycin was dosed frequently per day for bacterial infections. A21; A5547 (Asbell); A16431. Sandoz failed to show that erythromycin ointment had any favorable properties compared to other prior art compounds. Clarithromycin, the other commercially available macrolide, was an even worse choice that was ***never developed*** into a topical ophthalmic formulation because it was irritating to the eye. Indeed, those in the art concluded that macrolides were a "poor choice" for ophthalmic use. *Supra* Section I.C.3.

Sandoz asserts that azithromycin was an improved version of erythromycin. (SBr. 34). But the record shows that there was little, if any, improvement in activity by azithromycin over erythromycin. A5594-95, A5905-06 (Reed) (acknowledging for some bacteria "azithromycin was not as potent as erythromycin"); A12297-98. Regardless, to the extent there was improvement, it was based on oral azithromycin administration, which, as discussed below (*infra* Section V.B.4), bears no correlation to topical ophthalmic administration.

### 3.    Azithromycin's Chemical Properties
### Discouraged Its Use For Topical Ophthalmic Formulation

The District Court found that azithromycin's chemical properties taught away from its use as a topical ophthalmic treatment.  A46-47.  Those well-founded findings are unchallenged on appeal.

Both parties' formulation experts agreed that drug penetration depends on solubility, molecular size, electrical charge, and lipophilicity.  *Supra* Section I.C.3. Each of these factors discouraged topical use of azithromycin.  A26-28, A46-47.

Azithromycin is "practically insoluble in water," a clear obstacle to maintaining it in solution in the aqueous tear film (as required to penetrate the ocular surface) and for making an eye drop formulation.  A46-47; A16819; A6261-62 (Lee); A5937-38 (Reed); A16805; A16817; A16819; A19401-02. Azithromycin's molecular weight of 749 is about 50 percent higher than would be expected to achieve ocular penetration.  A46; A6265 (Lee); A11570; A16711; A19403-04.  Azithromycin also is electrically charged, and thus, difficult to absorb into ocular tissues.    Azithromycin's electrical charge is greater than erythromycin's, making it less likely than erythromycin to penetrate the eye.  A47; A6266-69 (Lee); A5942-44 (Reed); A11621, A11912; A19405-06.    Lastly, azithromycin's Log P (4.02) was significantly higher than the Log P expected to achieve improved corneal penetration (2-2.5), and ten-fold greater than

- 38 -

erythromycin's. Azithromycin was thus less likely than erythromycin to penetrate the eye. A27; A6276 (Lee); A11578-79, A12313; A19408-11.

Sandoz's contention that the District Court "concluded that a formulator's preference for fluoroquinolones would have taught away from azithromycin" (SBr. 40) is wrong. Rather, the Court considered "the totality of the evidence" discussed above, not just a preference for fluoroquinolones, and made well-supported findings that macrolides were a poor choice for topical ophthalmic use, that the chemical properties of azithromycin were even worse than erythromycin, and that a POSITA would have been discouraged from using azithromycin topically and had no expectation of success. A46-47; A6276-78 (Lee); A16141-42 (Ahmed).[5]

### 4. Azithromycin's Systemic Properties Would Not Have Provided Motivation or Reasonable Expectation of Success

Sandoz argues that azithromycin data for oral administration would have made obvious the use of azithromycin for topical ophthalmic administration. (SBr. 31-32). That argument was rejected by the District Court because there is no

---

[5] Thus, Sandoz misplaces reliance on inapposite cases recognizing that the existence of more preferred examples does not "teach away" from the invention. (*See* SBr. 40-41). Also, because functional properties of compounds in the art should be considered, not just structural similarities, Sandoz misplaces reliance on *DyStar Textilfarben GmbH & Co. v. C.H. Patrick Co.*, 464 F.3d 1356 (Fed. Cir. 2006) and *In re Dillon*, 919 F.2d 688 (Fed. Cir. 1990), which concern structural similarity in general. Upon consideration of all of the functional properties of azithromycin compared to compounds in the art, including erythromycin, the District Court found Sandoz failed to show motivation or reasonable expectation of success.

correlation between absorption of an orally administered drug and penetration by a drug topically administered to the eye. A44-45.

It is undisputed that drug absorption in the gut and drug penetration in the eye differ vastly because the gut absorbs and the eye defends. More specifically:

- the gastrointestinal tract has a large surface area and volume designed for absorption, while the surface area of the eye is small and includes mechanical means for removing drugs;

- a drug remains in contact with the gastrointestinal tract for hours, compared to minutes in the eye (the longer the drug remains on the surface of a membrane the more likely it will be absorbed); and

- cells of the gastrointestinal tract are designed for absorption, while ocular cells are designed to protect against foreign substances.

A5134-45 (Goren); A5896-902 (Reed); A6119-27 (Abelson); A19312-16; A19352; A19388-94. Indeed, few drugs that are absorbed by the gut possess the properties "required to overcome the constraints imposed by the eye" for drug penetration. A16821-46, A16839 (Lee); A6256-57 (Lee). Thus, Dr. Goren's generalized assertion that "higher concentrations" are applied topically (SBr. 32) begs the question of whether a drug will achieve ocular penetration. Dr. Asbell testified that a POSITA cannot assume that administering high concentrations of a drug will ensure penetration of the drug into ocular tissues. A5524.

Also, the means by which azithromycin reaches an infection when administered orally would discourage its use as a topical ophthalmic formulation. As Sandoz acknowledges (SBr. 33), the majority (about 60%) of orally dosed

azithromycin reaches an infection by phagocytosis, a process which transports azithromycin to the infection via the bloodstream. A24-25; A6109-10 (Abelson); A6333-34 (Lee); A16557. Areas of the eye are avascular (without blood). A6102 (Abelson); A5502-03 (Asbell). And, Sandoz's Dr. Goren testified phagocytosis is "absolutely not relevant" to bacterial conjunctivitis. A5173-74. Thus, as the District Court found, nothing in the record suggests that oral administration of azithromycin utilizing phagocytosis "demonstrates that azithromycin could permeate conjunctival and corneal tissues when applied topically." A45; A6110 (Abelson). Sandoz's assertion that phagocytosis would not have deterred a POSITA from "investigat[ing]" azithromycin is thus contrary to the evidence.

Based on this evidence, the District Court found that there was "little or no relationship between oral dosing and topical ophthalmic dosing regimens." A44-45. Thus, for these reasons, Sandoz's heavy reliance on azithromycin's efficacy against trachoma based on oral administration (SBr. 31-32) is misplaced. Prior to the '411 invention, all data showing that azithromycin was effective for trachoma (and any other infection) was based on oral administration – which does not correlate to topical ophthalmic administration, and would not have provided motivation to use azithromycin topically or a reasonable expectation of success.

Sandoz also relies on the WHO Report and comments allegedly made by Dr. Dawson at the WHO meeting relating to treating trachoma. (SBr. 35-38). First,

Sandoz's reliance on them is wrong because neither is prior art. As the USPTO acknowledged (and Sandoz has never challenged), the inventor's work for the '411 patent was done before the WHO meeting occurred. A16981-85, A16981 (Ahmed Declaration); A13338-42 ('411 File History); *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576 (Fed. Cir.1996) ("a document is prior art only when published before the invention date."). Moreover, Sandoz never proved when the WHO Report was published, and the WHO presentations in Europe do not qualify as prior art. A34; A4813-15; *infra* Section VIII.

Second, Sandoz's (and Plaintiffs') experts provided reasons why a POSITA would not have been motivated to use azithromycin topically for trachoma based on the WHO Report. Sandoz's Dr. West testified that trachoma is an extraocular, systemic disease (not just an eye infection), and emphasized that treating extraocular sources of infection was "important" to defeating trachoma. A5343-44. She admitted that because topical azithromycin would not affect the extraocular infection, there "was not a need to make a topical ophthalmic [azithromycin] formulation to treat trachoma." A5349-50, A5328-31. So did Dr. Reed. A5991-92 ("[T]he fact that topical azithromycin would not affect extraocular reservoir[s] is a reason that there was not a need to make a topical ophthalmic azithromycin product to treat trachoma.").

- 42 -

Dr. Reed also admitted that the WHO Report includes "objections" because topical application would not fully treat trachoma and would "not have the effective increased level of drug" achieved by phagocytosis on oral administration. A5988-90; A12487 (WHO Report); A6332-34 (Lee).

Sandoz also relies on Dr. West's testimony concerning Dr. Dawson's presentation at the WHO meeting. But Dr. West recalled only his comments that "topical treatment might not affect extraocular" infections, and may be expensive. A5305-06. Neither comment suggests use of azithromycin for treating trachoma topically.

Thus, there was ample support for the District Court's finding that the WHO references were "not optimistic regarding the likelihood of success of" and "do not demonstrate a motivation to combine references or a reasonable expectation of success of" an azithromycin topical treatment. A48. And, as shown above, contrary to Sandoz's assertions, the Court's finding that "trachoma is not relevant" was based on the testimony of Sandoz's own experts, as Dr. Goren testified, treatment of trachoma is "not relevant in terms of using an eye drop." A5170; A35.

Thus, Sandoz's assertion that the District Court "disregarded" the WHO references (SBr. 35-36) is wrong. The Court admitted the WHO references in evidence and allowed Sandoz to elicit testimony from its experts on those very

- 43 -

references.  Sandoz's real complaint is not that its evidence was disregarded, but rather, that it was considered and rejected.

Finally, the District Court correctly rejected Sandoz's argument that a POSITA would have been motivated to make a topical azithromycin treatment because topical drugs reach higher concentrations then oral drugs.  (SBr. 32).  As discussed above, there is no correlation between oral administration and topical administration, and ocular penetration depends on several factors relating to the chemical properties of the drug.  *Supra* Section I.C.3.  As Dr. Asbell explained, a POSITA "would not assume that delivering high concentrations of a drug to the eye topically would ensure that the drug would penetrate the ocular tissue simply because the drug was successful when administered systemically." A17; A5519, A5524.  The Court found Dr. Asbell's testimony more credible than Sandoz's experts.  A17-18.  Such credibility determinations are "virtually unreviewable." *Hambsch*, 796 F.2d at 436.

### 5.    Once Daily Dosing of Claim 3 Was Not Obvious

AzaSite® was the first – and remains the only – topical ophthalmic antibiotic approved by the FDA for once daily dosing.  A5551 (Asbell).  Despite this fact, Sandoz argues that once daily dosing would have been expected by a POSITA of the time of the '411 invention.

Sandoz contends that because erythromycin could be dosed "one or more times daily," that would create an expectation of the same dosage for azithromycin. But the District Court rejected that assertion finding that erythromycin was known to be "poorly absorbed," was dosed "four to six times per day," and that "one dose per day is not adequate to treat [] infection[s]." A21; A16431; A5547-48 (Asbell).

Sandoz also argues that because azithromycin is dosed once per day orally, one would have expected it to be dosed once daily topically. However, as discussed above, an oral dosing regimen cannot be extrapolated to topical application. A44-45.

### 6. The Dosing Range of Claim 5 Was Not Obvious

Sandoz argues that "[t]here was nothing inventive about the particular [dosing] range recited in claim 5," relying on concentration ranges for different active ingredients in both oral and topical ophthalmic drug formulations. (SBr. 43-44). The District Court rejected that argument, finding that there is no relationship between oral and topical dosing. A18; A5546 (Asbell). Nor could a POSITA use erythromycin as the basis for dosing azithromycin because of their differences in Log P. A6283-84 (Lee). As this Court recognized in *Alcon*, a POSITA "would have known that one could not simply substitute one active ingredient for another without adjusting the concentration." *Alcon*, 687 F.3d at 1371.

- 45 -

### 7. Dr. Reed's Own Patent
### Application Undermines Sandoz's Positions

Finally, Sandoz's obviousness assertions are undermined by its expert Dr. Reed's patent application directed to topical ophthalmic formulations. A47-48. That application, filed in 1994 prior to the '411 invention, identified over 70 compounds that could be used and claimed 24 antibiotics, including erythromycin. A16980 (col. 13:34-41); A5966-69 (Reed); A19369. But Dr. Reed did not include azithromycin, which had been FDA approved for oral use, in his list of antibiotics for use with his topical ophthalmic formulations. A38-39; A5966-70 (Reed). If use of azithromycin in a topical ophthalmic formulation was so obvious, Dr. Reed would have included it on that list. In other words, what he said was obvious at trial in 2013 was clearly not obvious in 1994.

## VI. The ISV Patents Are Not Obvious

### A. Sandoz's "Framing" Argument Fails

For the same reasons discussed at Section V.A, Sandoz's "misframing" argument as to the ISV patents fails. The District Court did not require Sandoz to prove that "DuraSite® was the most preferred option." (SBr. 46). Rather, the Court found that the problem to be solved was how "to improve topical ophthalmic treatments." A86. Regardless, nothing precluded Sandoz from proving that combining polycarbophil with azithromycin would have been obvious – Sandoz simply failed to do so.

- 46 -

As with the '411 patent, Sandoz's "misframing" argument for the ISV patents improperly uses the claimed inventions as a roadmap.  Dr. Reed admitted that "he *focused* his research of the prior art on DuraSite® because he knew it contained polycarbophil" based on his work with InSite.  A93 (emphasis added); A5875-77 (Reed).  The District Court's finding that Dr. Reed used improper hindsight that is "fatal to Sandoz's case" (A94) is well supported.

### B. The District Court Correctly Found That The Inventions Of The ISV Patents Were Not Obvious

### 1. The Art Taught Away From Using An Aqueous Polymer With Azithromycin

It is undisputed that a POSITA preparing an ophthalmic formulation would have considered the stability and solubility of azithromycin in water.  A78.  Dr. Reed never disputed Dr. Lee's testimony, supported by the prior art, that "azithromycin is known to be unstable in water and decompose."  A6292-93, A6410-14 (Lee); A16805; A16852; A16864; A19418.  Nor did Dr. Reed dispute that "Pfizer failed to develop a water-based azithromycin formulation and instead made a lyophilized (or "freeze-dried") formulation [which] further demonstrated the knowledge in the art that azithromycin is unstable in water."  A78; A6294-96 (Lee); A16194-95 (Bowman); A19419.

Drs. Lee and Ahmed testified that the instability of azithromycin in water would have been a concern with water-based polymer systems.  A50; A16126-27,

A16130, A16132 (Ahmed); A6320-22, A6327-29 (Lee). For example, there would have been a "serious concern" about using azithromycin with AquaSite®, which used water-based polycarbophil. A79; A6311-14 (Lee). Indeed, Dr. Reed "conceded that the stability and solubility of azithromycin would have been a concern in formulating azithromycin in [polycarbophil]." A78; A5893-94. Yet, the art Dr. Reed relied upon "lacked the information necessary" to show that a water-based polymer system would be compatible with azithromycin. A78-79.

There was ample evidence that azithromycin's poor solubility also would have discouraged its use with an aqueous polymer like polycarbophil. A78; A6260-62 (Lee); A5937-38 (Reed); A16819; A16805; A16817; A19402.

Thus, the District Court's finding that a POSITA would "not have selected azithromycin for inclusion" in a water-based polymer system (A94), is well-supported. The nonobviousness of the ISV patents may be affirmed on this basis alone.

### 2. Sandoz Failed To Show It Was Obvious To Select Polycarbophil From Among Innumerable Options

As discussed above (*supra* Section VI.B.1), Sandoz bears the burden of showing that a POSITA would have had reason, based on "functional properties and limitations," to select polycarbophil "over other compounds in the prior art." *See Daiichi,* 619 F.3d at 1354.

The District Court correctly found that if a POSITA ignored that azithromycin was unstable in water, there were many drug delivery options. A59-62; A96; *supra* Section II.A.2. Indeed, if forced to ignore azithromycin stability issues, a formulator would have selected colloidal systems and combination systems (not polycarbophil), because those systems could potentially protect azithromycin from exposure to water. *Id*. Even ignoring those more desirable options, and considering only water-based gels, there were about 40 gel options (which also could be combined to create even more options) with no clear choice. And, because azithromycin degrades in water, there was no reasonable expectation that any water-based gel option would succeed. *Id.*

As the District Court found, "Dr. Reed did not refute Dr. Lee's testimony that other options for delivery systems were available … and a POSITA would not have had a reasonable expectation of success [with polycarbophil]." A81. The Court "credit[ed] Dr. Lee's testimony over that of Dr. Reed" as to what a POSITA's preference would have been among the available options. A96.

Sandoz's reliance on *Merck & Co., Inc. v. Biocraft Labs., Inc.*, 874 F.2d 804, 806-807 (Fed. Cir. 1989) is misplaced. In *Merck*, a single prior art patent disclosed the claimed combination of two drugs, and suggested that the disclosed combination was desirable for the purposes taught in the art. *Id.* In contrast, here, Dr. Reed admitted there is no prior art reference disclosing the claimed

combination of azithromycin and polycarbophil. A5877-78. And, as demonstrated above, it is unrefuted that a POSITA would not have expected that combination to succeed given the water-instability concerns. Because of the vast number of formulation options available, the unpredictable nature of formulation science, and the instability of azithromycin in water, the ISV patents are nonobvious. *LEO Pharm. Prod. Ltd. v. Rea*, 726 F.3d 1346, 1356 (Fed. Cir. 2013) ("[T]he breath of these [formulation and ingredient] choices and the numerous combinations indicate that these disclosures would not have rendered the claimed invention obvious to try.").

###### 3. The District Court Correctly Found That The Art Would Not Have Motivated A POSITA To Select Polycarbophil Or Provided An Expectation Of Success

Sandoz asserts that based on various references the combination of azithromycin and DuraSite® would have been obvious. (SBr. 46-50). The District Court rejected that argument finding Dr. Lee's interpretation of the prior art more credible than Dr. Reed's. A95-96.

Sandoz's brief mixes and matches disclosures from the '535 patent, the AquaSite® label, the Bowman Article, and the DuraSite® presentation.[6] But after considering those references and the testimony of Drs. Lee and Reed, the District

---

[6] Dr. Reed focused on disclosures of DuraSite® because they were from the InSite inventors. A5876-5877. But relying on the insight of inventors is improper. *Eli Lilly & Co. v. Teva Pharms. USA, Inc.,* 619 F.3d 1329, 1340 (Fed. Cir. 2010).

Court found that there was no motivation to combine azithromycin and polycarbophil because each "lacks data regarding stability in water of any of the compounds, let alone azithromycin, and azithromycin was known to be unstable in water." A76, A78-79; A5975-79 (Reed); A6292-93, A6410-15 (Lee); A16805; A16852; A16864; A19418; A16194-95 (Bowman); A11420-28. The Court thus found that a POSITA would not have had a reasonable expectation of success using water-based polycarbophil because there is no evidence that polycarbophil would have solved the water instability issues of azithromycin. A96-97; *see supra* Section VI.B.1-2.

There are additional flaws in Sandoz's references. The District Court found that the '535 patent, arguably Sandoz's most informative reference, is "extremely general" with "ranges of the possible properties of the [described] polymer" that were "quite expansive." A75; A6315 (Lee); A5978-82 (Reed). As Dr. Reed conceded, a POSITA would have had to determine the proper polymer viscosity, proper concentration of polymer, and how much active ingredient to include in the formulation based on the expansive ranges disclosed in the '535 patent. A75; A5978-82.

Sandoz's other references are even more general, lacking any information regarding polymer amounts, other formulation ingredients, efficacy, safety, toxicity, or stability. A96; A6301, A6310-15 (Lee); A5975-78 (Reed). Based on

this evidence, the District Court found that "[g]iven the range of factors and options at play in these formulations, the absence of such information is fatal to any argument that the ISV Patents were obvious on the basis of these references." A96.

Sandoz also argues that a POSITA would combine the '535 teachings and azithromycin because erythromycin is among the laundry list of compounds disclosed. (SBr. 49). But a POSITA would focus on the '535 examples, disclosing only two active ingredients (fluorometholone and pilocarpine) – which are very different from azithromycin. A75-76; A6316-18 (Lee); A11425-27. Other than the examples, the '535 patent provides no guidance as to which compounds, if any, from its laundry list could be successfully formulated with its polymer systems. A6316-18 (Lee); A11424-25. Indeed, Dr. Reed admitted there is no evidence that erythromycin could be successfully formulated with the '535 polymers. A76; A5983-84 (Reed); A6316-18 (Lee). Tellingly, it was undisputed that "azithromycin was known to have antibiotic properties at the time the '535 Patent was filed, yet the '535 Patent does not list it as a possible choice in the laundry list of compounds." A76; A5984-85 (Reed).

Sandoz again tries to rely on the WHO Report and Presentation, which the District Court correctly found are not prior art. A34; A4813-15; *infra* Section VIII.

- 52 -

Nevertheless, the Court fully considered and rejected Sandoz's arguments based on the WHO Report and Presentation.

Sandoz's contentions notwithstanding (SBr. 47), there is no evidence that DuraSite® was discussed at the WHO presentation. Sandoz's expert Dr. West, who provided the only evidence on that presentation, had limited recollection of what Dr. Dawson presented, and she did not testify that he mentioned DuraSite®. A32-33; A5309-12.

As for the WHO Report, it provides reasons not to make an ophthalmic azithromycin formulation. *Supra* Section V.B.4. Notably, this Court previously recognized that the WHO Report "pointed out that 'several vehicles' were available to administer drugs topically, and it listed a few of them, including a product called Durasite." *Dawson v. Dawson*, 710 F.3d 1347, 1348 (Fed. Cir. 2013). Dr. Lee explained that a POSITA would have known that there would be stability concerns with the three water-based vehicles on that list. A6338; A12488. Dr. Reed conceded that a POSITA would have known that there were many other potential polymers available besides DuraSite, and that the WHO Report does not provide any "concentration of azithromycin," nor "specific formulation information" details, nor any efficacy, safety, toxicity, or stability data. A5993; A6336 (Lee); A12486-89.

And, the District Court correctly found that the WHO Report's reference to DuraSite® did not clearly disclose polycarbophil because the "word 'DuraSite' could refer to a variety of polymer systems," and there is no indication that Dr. Dawson equated "DuraSite" with "polycarbophil."[7]  A68-69; A16167-68, 16181-82 (Bowman).  Accordingly, nothing in the WHO Report suggested that a topical ophthalmic azithromycin formulation with a water-based polymer would have been successful.  A6336-38 (Lee).

And, Sandoz's assertions regarding DuraSite® are undermined by testimony from its own expert.  For eleven years prior to the filing of the ISV patents, Dr. Reed was "responsible for developing topical ophthalmic formulations" at several companies, and worked directly with and received "technical materials" regarding polycarbophil from InSite.  Yet, prior to the ISV inventions, Dr. Reed never suggested formulating azithromycin and polycarbophil for ophthalmic use. A5996-99; A93, A95.  These real-world facts belie Dr. Reed's hindsight driven, after-the-fact opinion that combining azithromycin and DuraSite® would have been obvious.  A95.

---

[7]     Sandoz mischaracterizes DuraSite® as an "off-the-shelf" product.  (SBr. 49).  "DuraSite" was a general term used by InSite for polymer delivery systems, which included several different polymers.  A68-69; A16167-68, 16181-82 (Bowman).

### 4. The District Court Correctly Found The ISV Inventions Non-Obvious Over The '411 Patent

The District Court did not "disregard" the teachings of the '411 patent, as Sandoz contends. It was Dr. Reed, not the District Court, who eliminated the '411 patent from consideration as a reference against the ISV patents. Dr. Reed "used December of 1996 as the cut-off date for prior art references asserted against" those patents. A49-50; A5878-81. Because the '411 patent application was filed in December 1997, it was after his cut-off. The Court did not abuse its discretion by holding Dr. Reed to his word.

Nonetheless, over Plaintiffs' objections, Sandoz was permitted to elicit Dr. Reed's opinions as to why he believes the '411 patent renders the ISV patents obvious. The District Court did not ignore that testimony – instead, it rejected Sandoz's arguments in a lengthy and detailed discussion of that patent. A49-54.

Sandoz also erroneously argues that the District Court held that Sandoz could not prove obviousness based on the '411 prophetic examples. The Court did not so hold, but rather considered all of the evidence regarding that patent and found that water-based "examples fall far short of satisfying Sandoz's burden." A95. In particular, Drs. Lee and Ahmed testified that a POSITA would have had stability concerns with examples disclosing combinations of azithromycin and water-based polymers, including the use of Carbopol 934P, because such formulations would include water. A53; A6326-30 (Lee); A16126-27, A16130,

A16132 (Ahmed). Those concerns were confirmed by the fact that the only '411 examples actually prepared were non-water-based ointments, which are also the preferred embodiments. A50-51; A6319, A6329 (Lee); A5986-87 (Reed); A19433. The '411 patent did not alleviate those concerns, because it lacks stability data for its water-based examples. A51, A95; A6320-21, A6328-29 (Lee); A5987 (Reed).

Sandoz's assertion that Dr. Lee's testimony regarding the aqueous instability of azithromycin is "conclusory and speculative" (SBr. 54) is wrong. It is irrelevant whether Dr. Lee knew why water-based examples were included in the '411 patent. As the District Court correctly found, "Dr. Lee's testimony that a POSITA would have had concerns about the stability of azithromycin in those ['411] example formulations was **uncontroverted**." A95 (emphasis added). That uncontroverted testimony was based on prior art and corroborated by Dr. Ahmed. A95; A16126-27, 16130, 16132 (Ahmed); A16805; A16852; A16864; A19418.[8] Even Dr. Reed "conceded that the stability and solubility of azithromycin would have been a concern in formulating azithromycin in [a water-based vehicle]." A78; A5893-94.

---

[8]    Sandoz mischaracterizes the testimony of Dr. Ahmed (SBr. 54), who believed that the formulation of Example 5 would "work" only in the sense that it would "get[] into the eye," and who specifically testified that he had "concerns" about the stability of Example 5. A16130-31.

Finally, Sandoz incorrectly attempts to equate Carbopol 934P with polycarbophil. (SBr. 51). Drs. Reed and Lee both testified that there are significant differences between "Carbopol" disclosed in the '411 patent, and the polycarbophil of the ISV patents. A51-53. Dr. Reed testified that because of its "very unique crosslinking agent 'polycarbophil swells dramatically, but it never goes completely in to the solution,'" and that "Carbopol . . . goes completely into solution." A5639, A5791, A5804, A5806 (Reed); A6327 (Lee). Polycarbophil is an *in situ* gel that increases in viscosity when applied to the eye. A5783-84 (Reed). Dr. Reed acknowledged that the '411 specification does not describe Carbopol 934P as an *in situ* gel. A5807, A5810-11. Dr. Lee confirmed that Carbopol 934P is not an *in situ* gel. A6323-24. Thus, the '411 disclosure of Carbopol 934P would not have directed a POSITA to polycarbophil.

The District Court did not ignore the '411 patent, but instead found that it failed to support obviousness.

\* \* \*

Sandoz failed to demonstrate that the prior art suggested that using a water-based delivery system would successfully avoid the instability and insolubility issues of azithromycin in water. As Dr. Lee testified: "[T]he two key things are that this drug is not soluble in water and unstable, and, yet, you have a ***product that overcomes those two main barriers***." A6339-40 (emphasis added); A84.

## C.    Claims Reciting pH and MIC Limitations Are Not Obvious

The District Court also found that claims specifically reciting pH and $MIC_{50}$ were nonobvious. A97-98.

### 1.    Claims Reciting pH Limitations

Claim 12 of the '893 patent recites that the pH of the claimed composition is 6.3. The District Court's finding that "the pH ranges in the '893 Patent would not have been obvious to a POSITA in 1998" is based on the prior art and witness testimony. A97. The prior art did not suggest making a formulation of azithromycin and polycarbophil at pH 6.3, nor that such a combination would be successful. A97; A6296-98 (Lee).

Dr. Reed admitted that a pH of 7.4 is most suitable for patient comfort, and in contrast, azithromycin is most soluble in water at pH 5.0 or below. A5623-25 (Reed); A6297-98 (Lee). But, both are 10-fold away from the claimed pH 6.3, and 100-fold away from each other. A6298-99 (Lee).[9] Also, nothing in the art taught that azithromycin would remain in solution at pH 6.3. A6298-99 (Lee). Azithromycin is completely soluble at pH 5.0, and only "sparingly soluble" at pH 7.0. A5622-24, A5936-38 (Reed); A6261-62, A6277-78, A6298 (Lee); A16805; A16812, A16817, A16819. And, the District Court found that "nothing in the art

---

[9]    Because pH is in logarithmic scale, a two unit difference differs by 100-fold.

taught that azithromycin would be stable in a solution at the pH of 6.3."   A97; A6298-99 (Lee).

Sandoz's argument that optimizing pH is "a routine process" (SBr. 55) was rejected by the District Court.  Dr. Reed testified that "he would adjust the pH level to reach the desired viscosity based on [the] '535 Patent."  A97.  But his testimony was "unsupported" because the preferred pH range in the '535 patent is 4.0-6.0, which incorporates a 100-fold difference.   A97; A11424 (col. 7:50-51); A6298-99.[10]

Finally, both sides' witnesses agreed that "the pH of a formulation affects a variety of factors, including comfort, stability, polymer performance, and active ingredient solubility."   A97; A5625, A5850, A5891-92 (Reed); A6296-98 (Lee); A19421.   The District Court found that "[a] researcher would not be able to anticipate a proper balance of these factors." A97; A6296-98 (Lee).

Thus, because the art taught away from making a formulation having a pH of 6.3 to obtain a product meeting solubility, stability and comfort requirements, and because of AzaSite®'s unexpected properties discussed below (*infra* Section VII), Sandoz's cases – acknowledging the possibility of obviousness "where the

---

[10]    For these same reasons, it would not be "routine" for a POSITA to adjust the pH to 6.3 based on the pH range of 3.0 to 6.5 in the '535 patent.

prior art teaches a range of values that encompasses the claimed invention" (SBr. 55-56) – are inapposite.

### 2.    Claims Reciting MIC Limitations

Claim 6 of the '893 patent recites azithromycin levels that remain above $MIC_{50}$ for at least 12 hours.  The District Court "credit[ed] the testimony of Dr. Asbell—that a POSITA would not simply assume that delivering high concentrations of a drug to the eye, topically, would ensure that the drug would penetrate the ocular tissue—over that of Dr. Reed."  A97-98; A5524; *see also* A6301-04 (Lee); A19423.

Sandoz's argument that it would be "common sense" to maintain $MIC_{50}$ concentrations (SBr. 57) erroneously relies on oral azithromycin data, and ignores that "[t]he record is replete with references to the barrier in the anatomy of the eye to ocular penetration."  A98; *see supra* Section I.A.  The District Court correctly found that "Sandoz failed to show any correlation between concentrations of antibiotics following topical and oral administration."  A98; *see also* A16-18; A44-45; A5545-47 (Asbell).[11]

---

[11]    Moreover, there is no evidence in the record showing that the claimed azithromycin formulations could penetrate the eye in amounts sufficient for drug levels to remain above $MIC_{50}$ for at least 12 hours.

### 3. Remaining Patent Claims

The District Court's nonobvious finding is also well-founded with respect to other ISV patent limitations. The Court rejected Dr. Reed's testimony that the '535 patent rendered those limitations obvious. A73-76. As discussed above, the '535 patent does not motivate a POSITA to combine azithromycin and polycarbophil, nor provide an expectation of success. *Supra* Section VI.B.3. Dr. Reed conceded that the '535 patent disclosure is very broad, lacking guidance as to how much active ingredient or polymer to use in any such hypothetical combination. He admitted that a POSITA "would need to figure out" where within the broad ranges disclosed in the '535 patent a formulation could be made. A5979-82; A75-76.

## VII. The District Court Correctly Found That Unexpected Results And Long-Felt Need Support Nonobviousness

The District Court found that the claimed inventions of the '411 and ISV patents exhibited three distinct unexpected properties. A98-99. Those findings were not clearly erroneous.

First, azithromycin applied topically to the eye achieved unexpectedly high concentrations – a 60 fold increase in concentration after topical dosing as compared to oral dosing. A98-99; A6130-34 (Abelson); A16983-84; A19396. Dr. Asbell testified that this increase was "extremely high" and the concentrations

- 61 -

achieved were "remarkable," even when compared to the fluoroquinolones. A5527-28.

Second, azithromycin formulated with polycarbophil surprisingly achieved higher concentrations in corneal and conjunctival tissue when compared to topical application of azithromycin without polycarbophil. A98-99; A6137-38 (Abelson); A16986-92, at A16988-89 (Akpek); A19397.

Third, clinical trials demonstrated that bacteria deemed "azithromycin resistant" were effectively treated with the AzaSite® azithromycin polycarbophil formulation for 72% of patients. A99; A6145-47 (Abelson); A16964-72, at A16968 (Friedlaender).

Sandoz's experts did not dispute any of these studies or specific data. Instead, they merely provided generalized and unsupported testimony that topical ophthalmic formulations will have high tissue concentrations. Conclusory testimony is insufficient. *Upjohn Co. v. MOVA Pharm. Corp.*, 225 F.3d 1306, 1311 (Fed. Cir. 2000). After considering all of the evidence, the District Court found that Sandoz failed to meet its burden on this issue. *Am. Hosp. Supply Corp. v. Travenol Labs.*, 745 F.2d 1, 8 (Fed. Cir. 1984) ("the burden was on [challenger] to establish the lack of new and surprising results or the lack of criticality.").

Additionally, there was an unmet need for a topical ophthalmic antibiotic treatment that could be dosed once daily for the effective treatment of ocular

infections. AzaSite® fulfilled this long-felt need because it was the first, and is still the only, topical ophthalmic antibiotic FDA-approved for once daily dosing. A99-100; A5551 (Asbell).

Drs. Reed and West agreed with Plaintiffs' experts that decreasing the dosing frequency was desirable and would increase patient compliance. A5339 (West); A5649 (Reed). Dr. Reed acknowledged that three-times a day dosing "was the kiss of death," and that "going from three to either once or twice is fantastic." A5649. Only Dr. Goren disagreed, but his "testimony was rebutted by every other witness at trial." A93, A100 n.17.

## VIII. Exclusion Of The EPO Documents Was Not An Abuse of Discretion

The District Court's exclusion of the EPO file history, proffered only days prior to trial, is entitled to great deference, and should be overturned only upon a showing of abuse of discretion which Sandoz cannot make. *Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1381 (Fed. Cir. 2005).

First, as Sandoz acknowledges, Rule 16(e) of the Federal Rules of Civil Procedure allows amendment of a pre-trial order where necessary to prevent "manifest injustice." (SBr. 61). But, there was no "injustice" here. Sandoz was allowed to present all its evidence regarding the WHO documents in the EPO file without limitations. A33; A4816-17. And, Sandoz concedes that "consideration of

the EPO file is not necessary" to its invalidity case (SBr. 60), belying any alleged injustice.

Second, applying the four Third Circuit factors which Sandoz agrees govern, the District Court's exclusion of the EPO file was not an abuse of discretion.

As for the first factor – prejudice to Plaintiffs – the District Court concluded that Sandoz's "eleventh hour proffer" would prejudice Plaintiffs (A4812-13), finding that use of the EPO file "would be something [Plaintiffs] would have to do quite a bit of preparation" to rebut. A4813-14. Moreover, Sandoz never explained how its witnesses could have used the EPO file at trial as it was not cited or addressed in any of Sandoz's expert reports.

The second and third factors (incurable prejudice and disruption of trial) support exclusion given Sandoz's late proffer and the substantial time needed for Plaintiffs to address Sandoz's new evidence. *See* A4812-14. Also, because the 30-month stay of FDA approval for Sandoz's generic product was to expire three months after trial was to begin, any delay threatened to delay a merits decision until after the stay expired, potentially prompting a preliminary injunction motion to prevent a Sandoz launch, and unnecessarily burdening the Court. *See Sanofi-Synthelabo v. Apotex, Inc.,* 470 F.3d 1368, 1385 (Fed. Cir. 2006).

As to the fourth factor (bad faith) Sandoz argues that the absence of a finding of bad faith here "favor[s] Sandoz." (SBr. 62). But in Sandoz's case

*Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 720 n.7 (3d Cir. 1997), the Third Circuit recognized that "making no finding on the question of bad faith . . . is quite different from finding that there was no bad faith." In *Konstantopoulos*, the exclusion of evidence was upheld because late disclosure gave a party "a tactical advantage," and thus supports the District Court's decision here. *Id.* at 721. Sandoz was aware of the EPO file long before its pretrial disclosures were due, having produced a copy of it during fact discovery. A3910. Yet, Sandoz offers no reason why it waited until the eve of trial to add the EPO file to its trial exhibit list.

In fact, Sandoz's efforts to rely on the EPO file represented a complete change in litigation strategy. During discovery, Sandoz conceded that it never "argued that the WHO References are established prior art to any of the asserted patents." A2409-10. But Sandoz now argues that "[b]ased on InSite's admissions to the EPO, this Court should recognize that the WHO documents are prior art." (SBr. 63). Thus, Sandoz attempted to gain a tactical advantage by belatedly adding a ***new theory*** to the case.

Although not always considered, the District Court also weighed the potential importance of the EPO file, and found that statements Sandoz relied on were mere attorney argument. A4813-14.[12] Sandoz argues that Plaintiff InSite

---

[12] Contrary to Sandoz's representations (SBr. 62), the District Court stated only that "[s]ome courts might consider [the EPO files] to be pretty powerful evidence." A4812.

took positions before the EPO that are inconsistent with its positions here. But, Sandoz ignores that Plaintiff Pfizer, also a party to the EPO proceedings, did not. Significantly, Sandoz fails to mention that InSite's arguments did not prevail – the EPO upheld the validity of the European '411 counterpart, finding that one "would not have had a clue how to prepare a topical formulation suitable for once daily dosing" based on the art of record. A4814; A3945. Sandoz fails to explain why InSite should be wedded to assertions rejected by the EPO. Regardless, Plaintiffs' positions at trial here were entirely consistent with the ruling of the EPO.

Sandoz also argues that the EPO file proves the WHO documents and presentation are prior art (SBr. 60-61), an argument correctly rejected by the District Court. Under European law, "oral presentations in Europe are prior art and…any accompanying documentation, therefore, would also be prior art." (European Patent Convention art. 54(2)). But U.S. patent law does not recognize European oral presentations as prior art. A4813-15.

Sandoz nevertheless argues that InSite "unequivocally" told the EPO that the WHO documents are prior art. (SBr. 60). But none of the statements on which Sandoz relies establish that the WHO documents were published in the manner required by U.S. patent law, or when any such "publication" occurred. There is no evidence in the record as to when or how the WHO documents were published. A34; *In re Lister*, 583 F.3d 1307, 1311 (Fed. Cir. 2009) (References cannot be

"printed publications" without proof of the date on which the material was sufficiently publically accessible.).

Nor did InSite tell the EPO that the WHO documents are prior art. InSite disclosed the WHO *meeting* as prior art (which it was under EPO law). Specifically, InSite described Reference "D2" as the "1st Meeting 'WHO Alliance for the Global Elimination of Trachoma', Geneva (CH)," providing the dates the meeting occurred (June 30-July 1, 1997). A3815. In contrast, InSite described its other three references by patent numbers with a specific publication date, *e.g.*, WO 96/39995 having a "publication date: 19 December 1996." A3815.

## CONCLUSION

The judgment of the District Court should be affirmed.

Date:  June 19, 2014                    Respectfully submitted,


                                By:     /s/ Dominick A. Conde_____

                                        Dominick A. Conde
                                        Vishal C. Gupta
                                        Margaret A. Scoolidge
                                        Alyssa B. Monsen
                                        Fitzpatrick, Cella, Harper & Scinto
                                        1290 Avenue of the Americas
                                        New York, New York 10104
                                        (212) 218-2100

                                        Dennis C. Aeling
                                        Fitzpatrick, Cella, Harper & Scinto
                                        650 Town Center Drive #1600
                                        Costa Mesa, CA 92626

                                        *Attorneys for Plaintiffs-Appellees Inspire
                                        Pharmaceuticals, Inc. and Pfizer Inc.*


                                By:     /s/ Sheila F. McShane_____

                                        Sheila F. McShane
                                        GIBBONS P.C.
                                        One Gateway Center
                                        Newark, New Jersey 07102

                                        *Attorney for Plaintiffs-Appellees InSite
                                        Vision Incorporated, Inspire
                                        Pharmaceuticals, Inc. and Pfizer Inc.*

- 68 -

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

INSITE VISION INCORPORATED V. SANDOZ, INC.,

14-1065

## CERTIFICATE OF SERVICE

I certify that I filed this Brief of Plaintiffs-Appellees with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/EMF system and served a copy on counsel, listed, below, this 19th day of June, 2014, by the CM/ECF system and email.

David C. Doyle
James W. Huston
M. Andrew Woodmansee
Jeffrey M. David
**MORRISON & FOERSTER LLP**
12531 High Bluff Drive, Suite 100
San Diego, CA 92130
Telephone: 858.720.5100
Facsimile: 858.720.5125
Email: JHuston@mofo.com
Email: MAWoodmansee@mofo.com

Matthew M. D'Amore
**MORRISON & FOERSTER LLP**
1290 Avenue of the Americas
New York, NY 10104-0050
Telephone: 212.468.8000
Facsimile: 212.468.7900
Email: MDAmore@mofo.com

Deanne E. Maynard
Brian R. Matsui
Jessica E. Palmer
**MORRISON & FOERSTER LLP**
200 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: 202.887.8740
Email: DMaynard@mofo.com
Email: BMatsui@mofo.com
Email: JPalmer@mofo.com

*Attorneys for Defendant-Appellant Sandoz, Inc.*

Dominick A. Conde                                    /s/ Dominick A. Conde

Name of Counsel                                       Signature of Counsel


**Law Firm:**              Fitzpatrick, Cella, Harper & Scinto
**Address:**               1290 Avenue of the Americas
**City, State, ZIP:**      New York, NY 10104
**Telephone Number:**      (212) 218-2204
**FAX Number:**            (212) 218-2200
**E-mail Address:**        dconde@fchs.com

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**
INSITE VISION INCORPORATED V. SANDOZ, INC.,
14-1065

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME,
<u>TYPE-FACE AND TYPE-STYLE REQUIREMENTS</u>**

I certify that Plaintiffs-Appellees' brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief contains 13,704 words, excluding portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I also certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). The brief was prepared in Microsoft Word 2010 using a proportional 14-point Times New Roman type-face.

Dated: June 19, 2014      By:   /s/ Dominick A. Conde_____

Dominick A. Conde
Fitzpatrick, Cella, Harper & Scinto
1290 Avenue of the Americas
New York, New York 10104
(212) 218-2100
*Attorney for Plaintiffs-Appellees
Inspire Pharmaceuticals, Inc. and
Pfizer Inc.*